# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| JASON STUART ELKINS, | ) | Case No. 08-70076 |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM DECISION

The matter before the Court concerns the Debtor's Motion to Convert Chapter 13 Case to Chapter 11 ("Motion") and the Objection to Motion to Convert ("Objection") filed by Powell Valley National Bank ("Bank").  Following a hearing on February 2, 2010, at which time the Debtor testified, the Court took the matter under advisement.  Based upon the following findings of fact and conclusions of law, the Court will conditionally grant the Debtor's Motion.

## FINDINGS OF FACT

The Motion presently before the Court was filed on December 11, 2009, three days after the Court had entered an Order conditionally dismissing the Debtor's Chapter 13 case for failure to make payments to the Chapter 13 Trustee which were required by this Court's Order of October 13, 2009 as a condition of continuing the hearing on confirmation of the Debtor's proposed Chapter 13 plan from October 6 to December 1, 2009.  The December 8 Order dismissing the Debtor's Chapter 13 case granted the Debtor ten days in which to file a motion to convert his case to either Chapter 7 or Chapter 11 of the Bankruptcy Code.

The Debtor originally filed his petition seeking relief under Chapter 13 on January 16, 2008.  In his bankruptcy schedules the Debtor represented that he had total assets of $474,666.74 and total liabilities of $653,133.03. On Schedule A the Debtor listed unencumbered

real property assets of a one-half remainder interest in five tracts with improvements, all located in Wise County, Virginia, valued at $34,784. In Schedule B the Debtor listed various items of personal property, including a block plant valued at $200,000,[1] which in January 2008 was represented to be under construction,[2] a claim for monies owed by Jeco[3] to the Debtor valued at $102,754, various household items, a 2003 Ford F-250, a Yamaha ATV, a mobile home, a 1984 Thompson boat, and an individual flexible premium life insurance account. On Schedule C the Debtor listed exemptions totaling $21,983.21 in personal property.

Of the $653,133.03 in liabilities the Debtor scheduled, $146,135.28 was listed as secured debt and the remaining balance was listed as unsecured nonpriority debt. No priority claims were originally scheduled although a claim of the Commonwealth of Virginia Department of Taxation was reflected in a later filed proposed Chapter 13 plan. On Schedule D the Debtor listed three secured claims, those being a claim of First Community Bank for $59,005.46 secured by a 1996 Ford truck and two forklifts valued at a total of $24,000, a claim of Ford Motor Credit for $14,131.28 secured by the Debtor's Ford F-250 which was valued at $15,000, and a claim of

---

[1] This was listed as a partnership or joint venture interest, but no further information about the nature of such interest is provided in the schedules or the Statement of Financial Affairs.

[2] According to the testimony of the Debtor at the February 2, 2010 hearing, the block plant began operations sometime after the bankruptcy filing in 2008.

[3] JECO, Inc. is a Virginia corporation of which the Debtor is the President and sole stockholder. JECO, Inc. has its own bankruptcy case pending in this Court, which is case number 08-70515. JECO, Inc. is engaged in the trucking of sand and gravel, commercial construction and manufacturing of concrete blocks. Chapter 11 Voluntary Petition filed March 20, 2008, docket entry number 1, and Proposed Disclosure Statement filed August 15, 2008, docket entry 27, in Case No. 08-70515. Although the Debtor referred to JECO, Inc. as "Jeco" in his schedules, for purposes of this Memorandum Decision, the corporation will be referred to as "JECO" pursuant to the petition filed in JECO, Inc.'s proceeding.

Popular Housing Services for $72,998.54 secured by the Debtor's mobile home which was valued at $86,000. On Schedule F, the Debtor listed a significant amount of unsecured nonpriority debt as contingent and/or disputed, but did not list the consideration for much of the debt. Based on the representations in various proposed plans and several objections which were filed, the Debtor initially scheduled much of this debt as contingent and/or disputed because the obligations are based on personal guaranties which the Debtor signed for loans made by the creditors to JECO. Remaining unsecured debts disclosed included several credit card debts and a Ford Motor Credit debt on account of the Debtor's wife's vehicle. This Ford Motor Credit claim was provided for in certain of the Debtor's later proposed plans as a secured claim with payments to come from the Debtor's wife.

On his remaining schedules the Debtor represented the following: an obligation to Peggy Adams[4] identified as "$100,000.00 investment in block plant" was listed on Schedule G.[5] On Schedule H the Debtor did not list any co-debtors. Finally, on Schedules I and J, which the Debtor amended on June 27, 2008, the Debtor represented that he had total monthly take home pay of $3,140 from JECO and when combined with income from real property of $300, this left the Debtor with average monthly income of $3,440. The Debtor's combined monthly

---

[4] According to the Disclosure Statement originally proposed in the bankruptcy case of JECO, Inc., Case No. 08-70515, Ms. Adams is the Secretary of JECO, Inc. According to statements of counsel at the February 2, 2010 hearing, Ms. Adams is also the Debtor's mother.

[5] While the reason for listing this obligation in Schedule G dealing with executory contracts and unexpired leases is not entirely clear, the Debtor's first Chapter 13 plan in paragraph 11 provided as follows: "The contingent claim of Peggy Adams represents an equity investment in Debtor's block plant - Pine Mountain Block Co. - which will begin operations in approximately 60 days. That company will pay that claim." The name "Pine Mountain Block Co." does not appear in the Debtor's petition, schedules or Statement of Financial Affairs.

3

income, after adding in his spouse's income, was represented to be a total of $5,697.91 per month. His spouse receives regular income from her employer and she also receives some form of domestic support obligation. After subtracting the average monthly expenses of $4,186.50 represented on Schedule J, this leaves the Debtor with net monthly income of $1,511.41.

Although the Debtor originally proposed a Chapter 13 plan on the same day he filed his petition in this Court, no plan has ever been confirmed. Over the course of this case the Debtor has modified his initial plan five times. In the Debtor's first plan he proposed to pay the sum of $1,027.59 per month for sixty months to the Chapter 13 Trustee. In February 2008 he began to make payments to the Chapter 13 Trustee as required by 11 U.S.C. § 1326(a)(1). From February to June 2008 the Debtor paid the sum of $1,030.00 per month to the Chapter 13 Trustee. In June 2008 the Debtor then amended his plan to increase the proposed funding to the amount of $1,508.12 per month for sixty months. The next month the Debtor commenced making the higher payments contemplated by this proposed plan and made those higher payments for July, August, September, and October of 2008 but then resumed the originally proposed payments for the next nine months. A further amendment was then made to the plan on August 13, 2008 to add a provision for payment of a Ford Motor Credit lien on a 2007 Ford Explorer which is the vehicle used by the Debtor's wife. On March 27, 2009, a third amendment was made in which the Debtor proposed making payments of $1,225.62 per month for months one through sixteen of the plan, $2,001.18 for months seventeen through twenty-four, and $3,828.74 for months twenty-five through sixty. In May 2009 a fourth amendment was made, which proposed slight increases in funding for months one to sixteen and months twenty-five through sixty. The final amendment came on July 15, 2009, in which the Debtor proposed a

funding of $1,113.60 for months one through sixteen, $2,157.15 for months seventeen through twenty-four, and $4,034.86 for months twenty-five through sixty. Although the Debtor had been making payments of $1,030.00 from November 2008 to July 2009, he made a higher payment of $2,157.15 in August 2009 and then in September 2009 made a payment of $1,679.42. This September payment was the last payment made by the Debtor in this case, which ultimately resulted in the Court's December 8, 2009 Order requiring the Debtor to file a motion to convert or face dismissal of his case.

The various plan amendments made by the Debtor over the course of this case were made in an effort to resolve various objections of his creditors to confirmation. Notably, a number of objections to confirmation were filed by creditors on the basis of the personal guaranties that the Debtor had made on account of loans made to JECO. Because the Debtor's later proposed plans provided for payment on account of a number of these personal guaranties, proposed funding was increased to accommodate these added obligations. However, as argued by Powell Valley National Bank and Community Trust Bank in two particular objections to confirmation, the question was whether the Debtor had the ability to make those higher payments, especially in light of the Debtor's representations that the funding would come from two sources: income generated by his block plant and a stone/gravel operation in Kentucky once the necessary state permit had been obtained.[6] In the words of those creditors, the Debtor's

---

[6] According to the Disclosure Statement filed on December 10, 2009 in JECO's bankruptcy proceeding, an application for a permit to gather and crush stone was filed in the Commonwealth of Kentucky approximately eight months before the Disclosure Statement was prepared. According to representations of Debtor's counsel at the February 2, 2010 hearing, JECO's application is still not approved. However, as explained by the Debtor at the hearing, and as discussed further in this opinion, the block plant started operations in 2008.

proposal was "speculative." The same argument was advanced by counsel for Powell Valley National Bank at the hearing on the Debtor's Motion which is presently before the Court. Counsel for the Bank noted during the hearing upon such Motion that all the Debtor's Chapter 13 plans had provided in paragraph four that "[i]f this case were liquidated under Chapter 7, the debtor(s) estimate unsecured creditors would receive a dividend of approximately 100%."

At the hearing before the Court on February 2, 2010, Mr. Elkins testified in support of his Motion to convert this proceeding to Chapter 11. Although Mr. Elkins acknowledged that he has been under the protection of this Court for a little more than two years, never had one of his proposed plans confirmed, and defaulted in payments to the Chapter 13 Trustee in October 2009, he did point out that he had made regular payments to the Chapter 13 Trustee for twenty consecutive months up until that default. This testimony corresponds with the Chapter 13 Trustee's Receipt Listing which shows a total of $24,289.05 paid by Mr. Elkins. Nevertheless, Mr. Elkins acknowledged that he made no further payment after September 2009 to the Chapter 13 Trustee. Mr. Elkins then testified that, based on expectations for his Pine Mountain block plant, he will have the income necessary to resume payments for the benefit of his creditors if he is allowed to proceed in Chapter 11.

Mr. Elkins testified that he is the owner of JECO and JECO runs both the block plant on Pine Mountain and a trucking operation. Mr. Elkins explained that JECO's trucks are used to ship the blocks produced at the Pine Mountain plant. Mr. Elkins testified that these blocks are then sold to coal mining companies in the region. Although Mr. Elkins testified that the block plant had just begun operation in 2008, he did say that up until the late summer and early fall of 2009, the block plant had turned out to be a promising endeavor. Mr. Elkins

testified that the block plant was producing and shipping approximately 3,000 blocks per day[7] and Mr. Elkins testified that he personally receives a 5¢ royalty per block, which is income he receives in addition to his weekly $1,000 salary from JECO. However, beginning in late fall and early winter of 2009, the operations at the block plant ceased regular production.

Mr. Elkins testified that his block plant faced two primary problems in maintaining regular production. First, he stated that in the late summer and early fall a number of mechanical breakdowns occurred which made it impossible to maintain the production level which had been reached before then. He went on to explain that one of the mechanical breakdowns was to one of the two trucks used to haul and ship blocks. Mr. Elkins explained that when this problem occurred, productivity was effectively cut in half because only one truck was left to deliver completed orders. Mr. Elkins also explained that right around the same time that he was experiencing mechanical problems, there was also a reduction in the number of orders based on cut backs at the companies which ordered from him.

Mr. Elkins then testified that another major problem which effectively led to the full cessation of operations in the winter of 2009 was weather. Mr. Elkins explained that Pine Mountain had faced a particularly harsh winter and as of the February 2nd hearing, operations at that plant had still not resumed. Although Mr. Elkins explained that he did not foresee the same problems next year because he will have time to winterize operations, he testified that he had not

---

[7] In response to questioning from the Court Mr. Elkins testified that he ran the block plant five days a week, which means a maximum of twenty-three days a month of production. Assuming full production level with no downtime, to say the least an optimistic assumption, that would equate to a maximum of 69,000 blocks per month, which at a royalty of 5¢ per block would result in income to Mr. Elkins of $3,450 monthly, not counting his other income previously identified in this decision.

had time to do so this prior year.  Mr. Elkins testified that he anticipated resuming operations in the weeks ahead and that once so resumed, he expected to produce and ship at the level reached before the problems occurred.

When questioned on his ability to move forward in Chapter 11 and pay his creditors, Mr. Elkins testified that he could make payments in the range of $4,000 per month, as contemplated in his fifth amended plan in the Chapter 13 case, once the block plant is up and running again.  Mr. Elkins testified that he does have a monthly house payment, but his wife pays for the Ford Explorer and JECO pays for his truck.  The Debtor testified that the only remaining secured claim is the claim of First Community Bank which is secured by the forklifts that JECO uses.  Mr. Elkins testified that his creditors will receive more if a Chapter 11 is allowed to proceed as compared to a Chapter 7.  Mr. Elkins testified that if a liquidation were attempted, there would be problems in that his mother has a life estate on the property on which the block plant stands.  Mr. Elkins likewise testified that there may be problems as a result of restrictive covenants in the deeds for this property.  Mr. Elkins testified that he did not foresee any problems with the block plant beginning regular operations in the near future.  Although also questioned about the impact of the shutdown on his customer base at the block plant, Mr. Elkins testified that he has orders to fill and that his customers have been contacting him asking for block shipments and those customers are expecting shipments once the plant resumes operations.

It is quite clear that any projected ability of Mr. Elkins individually to reorganize in Chapter 11 hinges upon the ultimate success of his corporation's proceeding in this Court. JECO filed its petition in March 2008 and first proposed a disclosure statement and plan of reorganization on August 15, 2008.  Those documents have subsequently been amended three

times with the latest amendment having been made on December 10, 2009. JECO's disclosure statement now before the Court in that case was conditionally approved on December 11, 2009 and ballots on the plan of reorganization were docketed with the Court on January 28, 2010. However, as a result of a Motion to Convert the case to Chapter 7 filed by the Internal Revenue Service, the confirmation hearing has been continued to April 6, 2010 in an effort to resolve the Internal Revenue Service's Motion.

As reflected in JECO's disclosure statement and plan of reorganization, that corporation's ability to reorganize appears to be contingent on the success of both the block plant and the stone/gravel operation to be based in Kentucky. The "Revised Supplemental Cash Flow Projections for Block and Stone Operations (2010)" attached to the disclosure statement anticipates a net profit of $10,980 per month from which to make payments for the benefit of creditors. However, as noted previously, the Commonwealth of Kentucky has not yet taken action on the permit application for the stone/gravel operation. According to the projections, it appears JECO anticipates starting that operation by July 2010 given its notation of "Stone 7/1/10" on the document. However, according to these projections JECO expects $13,000 of a total $18,000 net profit before taxes coming from the stone/gravel operation and the remaining $5,000 of the total $18,000 net profit before taxes is projected to come from the block plant. Based on these projections, JECO anticipates and provides in the plan that it will make total payments of $3,223.42 for the benefit of its secured creditors and payments of $2,000 per month for the benefit of unsecured creditors to fund a projected dividend to them of 65%. In order for such plan to be confirmed, it will be necessary for this Court to determine, among other things, that such confirmation "is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the debtor . . . ."  11 U.S.C. § 1129(a)(11).

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984.  The determination of whether to grant or deny a motion for conversion is a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

Conversion from Chapter 13 to Chapter 11 is controlled by section 1307(d) of the Bankruptcy Code.  That section provides that "at any time before the confirmation of a plan under section 1325 of this title, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 or 12 of this title."  11 U.S.C. § 1307(d).  This Court has recently dealt with a debtor's contested motion to convert from Chapter 13 to Chapter 11 in the case of *In re Lester*, 409 B.R. 364 (Bankr. W.D. Va. 2009) and held that § 1307(d) contemplates a balancing of the interests of the debtor and its creditors and a consideration of whether an opposed conversion is in keeping with the overall purposes and spirit of the Bankruptcy Code.  409 B.R. at 372.

The Court concludes that the Debtor's failure for two years while enjoying the protection provided by the automatic stay to obtain confirmation of a Chapter 13 plan, combined with his failure to pay to the Trustee all of the payments called for in his various proposed plans, the ultimate cessation of payments altogether subsequent to September of 2009, and his inability to resist the Chapter 13 Trustee's motion to dismiss, clearly furnish a sufficient basis for this Court to deny the motion to convert to Chapter 11.  *See generally Anderson v. United States on*

*behalf of Small Business Administration*, 165 B.R. 445, 448-49 (S.D. Ind. 1994).  Nevertheless, it will conditionally grant the motion to convert upon the conditions and the reasoning which follow.

      While the Bank is a major unsecured creditor of the Debtor, there are many other creditors whose interests ought to be considered in deciding the Motion and Objection.  Based on the evidence before the Court, it is unclear how the Debtor's unsecured creditors may fare either in a Chapter 7 liquidation case or in attempts to pursue collection efforts against him should this case be dismissed.  While the Debtor's efforts to reorganize in Chapter 13 ultimately proved unsuccessful, neither were they a complete failure as Mr. Elkins did manage to complete and commence successful business operations of the block plant.  While as of the February 2nd hearing, the prospects for JECO were not particularly encouraging, it is not yet clear that it will not be able to move forward and obtain confirmation of a plan.  If that were to occur, the interests of the general creditors of Mr. Elkins might best be served by permitting him to present to them a payout plan over time so that they might in their presumed collective wisdom either support such a plan or reject it. At this point the Chapter 13 Trustee is holding $24,289.05 of funds paid to her by the Debtor during the pendency of the Chapter 13 case.  The existence of these funds might permit him to propose a plan providing for an early partial distribution to his creditors followed by a further payout over time based on JECO's operations.  Even though the Court, based on what has transpired to date, may not consider such a scenario probable, neither can it say that it is without any foundation or patently unreasonable.  The Court ultimately concludes that the collective interests of all parties in interest in this case will be served by providing to the Debtor "one more chance" to reorganize.  Accordingly, it will grant the motion

11

to convert, but will treat the Bank's Objection as a post-conversion motion to dismiss or convert the Chapter 11 case and will continue it for a hearing on the same date and time as the pending motion to dismiss or convert JECO's case on April 6, 2010. A further condition of the Court's grant of the motion to convert is that it will order the Chapter 13 Trustee to hold the funds paid to her during the pendency of this case until further order of the Court for the protection of the interests of the creditors whose actions with respect to enforcement of their claims against the Debtor or his property have been stayed for over two years. It will also direct that the Debtor shall file a chapter 11 plan and disclosure statement within twenty-one (21) days of this date. An order so providing will be entered contemporaneously herewith.

Decided this 16th day of February, 2010.

*[Signature: William F. Stone, Jr.]*

_____
UNITED STATES BANKRUPTCY JUDGE